# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

MICHELLE HAMILTON,     )
for next friend and minor son, J.H.,  )
             )
   Plaintiff,      )
             )
   v.          )   CAUSE NO.: 1:16-CV-132-TLS
             )
CITY OF FORT WAYNE, et al.,   )
             )
   Defendants.     )

## OPINION AND ORDER

The Plaintiff, Michelle Hamilton, on behalf of her minor son J.H., sued the City of Fort

Wayne and six of its police officer for events that occurred at her residence in October 2015 after

she called police for assistance with J.H., who is an autistic teenager. According to the

allegations in the First Amended Complaint [ECF No. 21], the City discriminated against J.H.

under Section 504 of the Rehabilitation Act and under Title II of the Americans with Disabilities

Act when it denied him the benefits and protections afforded to individuals without disabilities.

The Plaintiff also alleged that the officers, Manny Aguilar, Timothy Bobay, Shane Carrier,

Anthony Green, James Haupert, and Michael Sierks, violated the Fourth Amendment when they

either subjected J.H. to an unreasonable seizure involving excessive force or failed to intervene

in such a seizure. Lastly, the Plaintiff asserted a state tort claim for assault and battery against the

officers and, under a theory of respondent superior, against the City.

On August 28, 2017, the Defendants requested summary judgment on all the Plaintiff's

claims. (Defs.' Mot. for Summ. J., ECF No. 47.) The Plaintiff, in response, dismissed her claims

against Officers Aguilar, Bobay, Carrier, Haupert, and Sierks (Pf.'s Resp., ECF No. 49), but

opposed summary judgment on her claims against the City for violations of the Rehabilitation

Act and Title II of the Americans with Disabilities Act, as well as her claim that Officer Green violated the Fourth Amendment and committed assault and battery. On October 11, 2017, the Defendants filed a Reply Brief [ECF No. 53], and the matter became ripe for this Court's consideration.

## STATEMENT OF FACTS

At the time of the events at issue, J.H., at fifteen years old, was nearly 5'11", and 200 pounds. He has a variety of psychological disorders, including conduct disorder, borderline personality disorder, ADHD, and autism. According to the Plaintiff, J.H. has the intellectual functioning of someone who is younger than five, although this would not be apparent from his general appearance. It would, however, become evident by his chosen topics of conversation. J.H.'s history reveals that he is prone to severe "meltdowns" accompanied by intense physical aggression. He has hit, kicked, and/or bit numerous people in a variety of circumstances, including family members and school staff.

Of great concern to the Plaintiff is J.H.'s tendency to try to run away from his home without regard to his personal safety. The Plaintiff and J.H., along with J.H.'s siblings, including his older brother Jaiyvian, live in a townhouse near Lower Huntington Road. J.H. does not understand the danger that vehicular traffic presents to his well being. Therefore, when J.H. attempted to flee from his house on the evening of October 28, 2015, the Plaintiff asked Jaiyvian to stop J.H. from running toward Lower Huntington Road, where he could have been seriously injured. Additionally, had he succeeded in running away, they would have been faced with trying to find J.H. in the dark. When verbal attempts were insufficient to stop J.H., Jaiyvian

physically restrained J.H., who aggressively fought back by punching, kicking, and biting. The Plaintiff herself was hit by J.H. when she attempted to separate her two sons.

The Plaintiff called 911 to report that J.H. was attempting to flee the area of the home and to request assistance. Multiple officers promptly responded to the scene. They arrived to find J.H. and Jaiyvian punching and kicking each other while Jaiyvian lay on top of J.H. on the ground. J.H. was yelling, and the Plaintiff asked the officers to hurry. The officers struggled to break up the fight, and J.H. continued to roll around, kick, and resist as Officer Sierks and Officer Green attempted to control and restrain him. During the events, Jaiyvian broke away from two other officers, ran to J.H., and began yelling at Officer Green because he did not like the way that Officer Green was treating J.H.[1] Jaiyvian and J.H. were both eventually handcuffed. Jaiyvian was taken to a squad car. Because efforts to calm J.H. and to convince him not to flee were not successful, the officers decided the best course was to take J.H. to a separate squad car parked a short distance away.

J.H. initially refused to walk to the squad car, but then told the officer that he would walk on his own. However, when the officers agreed to let him walk, he went limp. On the way to the car, the Plaintiff kept trying to talk J.H. into calming down, but J.H. continued to scream while alternating between making his body go limp and trying to break free.

As the officers were trying to get J.H. to the squad car, he kicked Officer Sierks in the shin, causing him to stumble and lower his hold on J.H. Officer Green saw that Officer Sierks

---

[1] This account is based on Jaiyvian's deposition testimony. In Officer Sierks' supplemental report, he states that shortly after officers were able to separate the brothers, Jaiyvian broke away from officers and wrapped his hand around the front of J.H.'s neck and started pressing in an attempt to choke him and yelled that he was going to kill J.H. Officer Carrier and Bobay then pulled Jaiyvian off of J.H., and J.H. continued to try to kick Jaiyvian.

had been kicked, and thought it might have been a kick to the groin. According to the Plaintiff, she saw Officer Green punch J.H. one time in the face in response. Both parties agree that Officer Green told J.H. that if he did not walk or if he kicked at officers again, Green would use his taser. The parties also agree that the Plaintiff objected to Green's verbal threat, telling Officer Green that J.H. did not even know what that meant, and that he could not be tased because he was autistic and had seizures. In the Plaintiff's version, she also charged at Officer Green and yelled at him for punching her son, and he started yelling back.[2]

Eventually, J.H. was successfully placed in the squad car. Officer Aguilar, who had Crisis Intervention Team (CIT) training, was asked to come to the scene to assess the situation. CIT is a collaborative approach used by the Fort Wayne Police Department to address the needs of persons with mental illnesses, link them to appropriate services, and divert them from the criminal justice system if appropriate. Green, as well as the other officers who responded to the scene, had CIT and other mental health training. In 2005, Green had received forty hours of CIT training, which is the most detailed training provided. He also received a forty-five minute autism and CIT update in January 2013 and a thirty minute mental illness training in October 2014. Aguilar received the same forty hours of CIT training in 2010, but also received eight hours of CIT training in each of the following years.

After Officer Aguilar talked to J.H., Officer Green transported J.H. to the hospital, in accordance with standard protocols. J.H. was not treated for any injuries. Jaiyvian was let out of

---

[2] While there is some discrepancy in the exact sequence of events, it is undisputed that J.H. kicked Officer Sierks on the way to the squad car and was otherwise resistant to going to the squad car. Neither is there any dispute that Officer Green gave a warning about using a taser, but that he did not have it drawn or actually use it. The Defendants dispute that Officer Green hit J.H., but they assume that he did, as they must for purposes of summary judgment.

the squad car and not charged with any offense because the officers concluded that he had initially been attempting to help his mother with J.H.

## ANALYSIS

### A.    Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials, and thus summary judgment must be entered where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the defendants satisfy their initial burden upon a properly supported motion for summary judgment, the plaintiff is required to marshal and present to the court the evidence upon which a reasonable jury could rely to find in her favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Although facts and reasonable inferences are construed in favor of the nonmoving party, this does not extend to inferences supported only by speculation or conjecture. *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997).

### B.    Rehabilitation Act and Americans With Disabilities Act

Section 504 of the Rehabilitation Act and Section 202 of the ADA both prohibit discrimination against persons with disabilities. Under Section 504, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Section

202 similarly provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Claims under the two statutes can be considered together. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (noting that the claims were "functionally identical"); *Jaros v. Ill. Dep't of Corrs.*, 684 F.3d 667, 671 (7th Cir. 2012) (stating that the relief available under the ADA and Rehabilitation Act was "coextensive").

"[A] Title II claim under the ADA 'may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people.'" *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (quoting *Washington v. Ind. High Sch. Athletic Assoc.*, 181 F.3d 840, 847 (7th Cir. 1999)); *see also CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528–29 (7th Cir. 2014). However, "an accommodation only is required when *necessary* to avoid discrimination *on the basis of* a disability." *Wis. Cmty. Servs.*, 465 F.3d at 751; 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."). The same is true of accommodations under the Rehabilitation Act. *See Wis. Cmty. Servs.*, 465 F.3d at 754 (noting that a "modification is 'necessary' only when it allows the disabled to obtain benefits that they ordinarily could not have by reason of their disabilities, and not because of some quality that they share with the public generally").

The Plaintiff claims that there is a "genuine dispute of fact as to whether the City of Fort Wayne denied a reasonable accommodation to her fifteen-year-old mentally disabled son and whether that accommodation was reasonable under the circumstances." (Pl.'s Br. 16–17, ECF No. 50; *id.* at 17 (arguing that there is a dispute "whether J.H. was denied a reasonable accommodation under federal disability law by being denied the service of not being punched in the face while handcuffed").) The Court notes that the dispute the Plaintiff identifies poses a question regarding the application of the facts of this case to the law. That is, it identifies legal issues; it does not identify which historical facts the parties dispute. *See* Fed. R. Civ. P. 56(c) (a fact is something that can be supported by "citing to particular parts of materials in the record" such as affidavits and discovery responses); N.D. Ind. L.R. 56-1(b)(2) (requiring that a response brief include a section that "identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary"). Nevertheless, the Plaintiff's assertions are helpful to determining the nature of the disability discrimination claim she is advancing. Based on the argument presented in her Brief, the Court determines that the Plaintiff is alleging that the City failed to reasonably accommodate J.H.'s disability by modifying its services.

The Plaintiff defines the service J.H. was denied as the "service of not being punched in the face while handcuffed." This is not a helpful way to describe the service. If that were the service at issue, neither the ADA nor the Rehabilitation Act would be implicated by the denial of that service in this case. There is no evidence that the service was denied to J.H. because he is disabled. In other words, the Plaintiff has not "show that, 'but for' [J.H.'s] disability, [he] would have received the ultimate benefit being sought," *Wis. Cmty. Servs.*, 465 F.3d 755; this benefit being that of law enforcement's emergency response and intervention without being hit. There is

nothing in the record to suggest that Officer Green's response to J.H.'s resistance and kicking another officer would have been different if J.H. was not disabled, or that the same injury that J.H. suffered would not have been inflicted on a person with full mental capacity. Whether the force was unreasonable under the circumstances is a separate issue from whether it was based on J.H.'s disability. As a matter of substantive disability law, a case may not go to a jury without any evidence from which the jury could plausibly infer that the service being denied was denied because of a disability.

But that is not the end of the inquiry. In fact, it may be entirely appropriate to forego "the difficult semantics of categorizing each governmental action as 'services, programs, or activities.'" *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 338 (4th Cir. 2012) (quoting 42 U.S.C. § 12132). Although the statute references being excluded from or denied the benefits of "services, programs, or activities of a public entity," 42 U.S.C. § 12132, it contains the disjunctive clause "or be subjected to discrimination by any such entity," *id.* Several circuit courts have determined that this clause is "meant to be a 'catch-all phrase that prohibits all discrimination by a public entity, regardless of the context.'" *Seremeth*, 673 F.3d at 338 (first quoting *Bircoll v. Miami–Dade Cnty.*, 480 F.3d 1072, 1084–85 (11th Cir. 2007); then citing *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002); and then citing *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002)). *See also Bahl v. Cty. of Ramsey*, 695 F.3d 778, 787 (8th Cir. 2012) (using a broad interpretation of the ADA "to encompass 'anything a public entity does'" (quoting *Bircoll*, 480 F.3d at 1084)). The Seventh Circuit has not decided the issue, but even without taking such an expansive view, a police department's response to its citizens' 911 calls can readily be characterized as a service of a

public entity.

Accordingly, in the course of responding to the Plaintiff's 911 call and lending police assistance, the Defendants were required to reasonably accommodate J.H.'s disability if doing so was "necessary to avoid discrimination on the basis of disability," unless the "modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). The only specific accommodation the Plaintiff identifies is that the City implement a policy that permits only police officers with Aguilar's level of CIT training to respond to a scene involving a person with a mental disability. (Pl.'s Br. 18 (arguing that "the City could have prioritized or had a policy prioritizing the arrival [of] the officer recognized by the other officers as the 'CIT officer'" to a residence that they knew involved a mentally disabled person).) However, the Plaintiff does not present any facts from which is can reasonably be inferred that this would have altered the nature of the interaction or impacted its outcome. The Plaintiff does not dispute that Officer Green has received forty hours of CIT training—the most detailed CIT training offered—and the same training that Officer Aguilar received. The only quantitative difference between Officer Green's training and Officer Aguilar's training is that Officer Aguilar has received an additional eight hours of CIT training each year since completing the original forty hours. The Plaintiff has offered no evidence of a qualitative difference between Officer Aguilar's training and Officer Green's training. There is no evidence in the record that, because of his training, Aguilar (or another officer with his same training) would have responded differently than Green did to J.H.'s resistence and to his kicking another officer.

The Plaintiff speculates that, because CIT officers had successfully talked J.H. out of running away on prior occasions, the same outcome would have been achieved on October 28.

But, she offers no evidence pertaining to the training obtained by the unidentified officers who responded to those previous calls. Thus, there is no way to determine whether they had more training than Officer Green and the other officers who responded on October 28. Nor is there any attempt to show that the circumstances facing the officers on those other occasions were similar to those that existed on October 28 such that verbal de-escalation techniques would have been effective. J.H. and Jaiyvian were already involved in a physical altercation when the police arrived at their home on October 28. The Plaintiff was imploring the police to help calm J.H., but their efforts only maddened him more. (*See* Jaiyvian Dep. 37–38 (explaining that when the police arrived and "were there trying to calm him down, that was the maddest he, I've ever seen him.") It took substantial effort by several police officers to separate the fighting teens. Further intervention was needed to keep them separated. When officers attempted to put handcuffs on J.H., "he got upset more." (*Id.* at 40.) Without additional physical restraint, there would have been nothing to prevent J.H. from running away.

Further, a policy prioritizing the arrival of the CIT officer with the most training would not guarantee the timely arrival of that particular officer to the scene of an emergency. When responding to an emergency request for assistance, a policy of waiting for an officer designated as the CIT officer would potentially implicate other safety concerns that might have been avoided by the efforts of officers already on the scene. By failing to address the potential negative consequences of her recommended solution, the Plaintiff does not acknowledge that such a policy would fundamentally alter the nature of the service that law enforcement provides in response to 911 emergency calls. The accommodation begs the question whether, if Aguilar was twenty minutes away, and the other officers were five minutes away, the officers who

10

responded first would be obligated to watch J.H. and Jaiyvian fight each other, or to watch J.H.

run away while they waited for Officer Aguilar—the designated CIT officer—to arrive.

The Plaintiff's requested accommodation is not reasonable, and the Plaintiff has not

identified any other accommodation that would not "fundamentally alter the nature of the

service, program, or activity," 28 C.F.R. § 35.130(b)(7), particularly when officers are

responding to the type of scene that awaited them at the Plaintiff's house. The Court is not

suggesting that Title II does not apply to police encounters with citizens. However, the

reasonable accommodation assessment requires a consideration of whether, "given criminal

activity and safety concerns, any modification of police procedures is reasonable before the

police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to

the public or officer's safety." *Bircoll*, 480 F.3d at 1085 (holding that it would have been

impractical for an officer to wait for an oral interpreter before taking a field sobriety test during a

DUI stop of a deaf driver). Before the scene involving J.H., Jaiyvian, and the Plaintiff was under

control, overriding public safety concerns rendered the accommodation of prioritizing the arrival

of a different officer unreasonable. *See Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2009)

("We rely on and expect law enforcement officers to respond fluidly to changing situations and

individuals they encounter. Imposing a stringent requirement under the ADA is inconsistent with

that expectation, and impedes their ability to perform their duties."), *abrogated on other grounds*

*by Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015); *Hainze v. Richards*, 207 F.3d

795, 801 (5th Cir. 2000) ("Law enforcement personnel conducting in-the-field investigations

already face the onerous task of frequently having to instantaneously identify, assess, and react

to potentially life-threatening situations. To require the officers to factor in whether their actions

are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents.")[3]; *see also Sheehan v. City of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part, cert. dismissed in part*, 135 S. Ct. 1765 (2015) (holding that "the ADA . . . applies to arrests, though we agree with the Eleventh and Fourth Circuits that exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment"); *Bahl*, 695 F.3d at 784 (noting that "[e]ven if the ADA applied to [a] traffic stop," the defendant police officer was not required to accommodate the plaintiff's disability "under the exigencies of the traffic stop").

There is no material dispute of fact that requires a trial on the Plaintiff's disability discrimination claims. The record does not contain evidence from which a reasonable jury could conclude that the City was required by the Rehabilitation Act or the ADA to provide an accommodation to J.H. or to modify its services in the course of responding to a 911 emergency call and securing the chaotic scene that they encountered.

## C.      Excessive Force Against Officer Green

When public officers violate the constitutional rights of citizens, 42 U.S.C. § 1983 provides the vehicle for a legal claim. Officer Green has asserted that he is entitled to qualified immunity, which is a doctrine that protects government officials "from liability for civil damages

---

[3] The *Hainze* court took the approach that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." 207 F.3d at 801. Other courts have not foreclosed that the ADA might apply during these police encounters, but they have considered the circumstances, including the exigencies involved, in the analysis of what constitutes a reasonable accommodation during these encounters.

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Qualified immunity is intended to strike a balance between "protect[ing] a government official's ability to function without the threat of distraction and liability" and "afford[ing] members of the public the ability to vindicate constitutional violations by government officials who abuse their offices." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (internal quotation marks and citations omitted). Evaluating a qualified immunity defense requires two inquires: (1) whether the facts, taken in the light most favorable to the plaintiff, makes out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Williams v. City of Chi.*, 733 F.3d 749, 758 (7th Cir. 2013) (citation omitted). "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs*, 755 F.3d at 537. The Court is not required to address the prongs in order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Fourth Amendment clearly establishes the right to be free from excessive force during a seizure. However, while the general right to be protected from excessive force is established, the Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality." *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011). Instead, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)); *see also White v. Pauly*, 137 S. Ct. 548, 551 (2017) (stating that the plaintiff must identify "existing precedent" that would "have placed the statutory or constitutional question

beyond debate") (internal quotation marks omitted).

A claim that a police officer has used excessive force in the course of a "seizure" of a citizen is addressed to the reasonableness of the seizure under the standards established by the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 395 (1989); *Abdullahi v. City of Madison,* 423 F.3d 763, 768 (7th Cir. 2005). The reasonableness inquiry involves a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). That assessment must include a recognition that officers are often forced to make split second judgments in tense, uncertain, and rapidly evolving situations, as to the amount of force necessary in a particular situation. *Id*. at 396–97. Because the inquiry is an objective one, which examines whether the officer's actions are objectively reasonable in light of the totality of the facts and circumstances confronting him or her, the officer's subjective intent or motivations are not a consideration. *Id.* at 397; *Miller v. Gonzalez*, 761 F.3d 822, 828–29 (7th Cir. 2014). Use of force by a police officer is objectively unreasonable and excessive if, judging from the totality of the circumstances existing at the time, the officer uses greater force than is necessary for the purpose. *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012).

The Plaintiff asserts that the force used, specifically Officer Green's punch to J.H.'s face while he was handcuffed, was unnecessary and counterproductive. (Pl.'s Br. 21.) The Plaintiff offers the conclusion that the punch was not necessary or productive, but does not offer any

analysis of what made it so.[4] The closest the Plaintiff comes to providing an analysis is when she argues in response to Officer Green's assertion of qualified immunity that no reasonable officer "would believe that it was permissible to punch a handcuffed mentally disabled minor in the face when it was unnecessary and counterproductive to do so." (Pl.'s Br. 23.) Based on this, the Court presumes that the Plaintiff considers J.H.'s status as a minor and as a mental disabled person, as well as the fact that he was handcuffed, to be factors that contributed to the unreasonableness of the force. The Court considers these factors. However, it must also consider that these factors were only part of the totality of circumstances Officer Green faced.

The Plaintiff does not dispute that J.H. had been engaged in a physical altercation with his brother that required police intervention, that he struggled and fought with the officers who attempted to handcuff him, that he further resisted officers by going limp or kicking at them, and that he made forcible physical contact with an officer that caused the officer to stumble while trying to escort J.H. to a squad car. Thus, handcuffed or not, J.H. was able to resist and to kick an

---

[4] After citing the relevant legal standard, the Plaintiff provides the following paragraph as her analysis of the excessive force claim:

> Here, Mrs. Hamilton argues there was no necessity to punch her son in the face while he was handcuffed on October 28, 2015 and a reasonable officer on the scene would have known, if anything, punching J.H. in the face him [sic] would only escalated [sic] the situation. Defendants argue Defendant Officer Green was justified in punching J.H. in the face, Def. Brief at 19–22, and that the use of force was necessary to "neutralize the threat." Id. at 22. Defendants cite a number of cases where a reasonable officer would have believed the use of force was arguably necessary under the circumstances. Id. But they cite no cases where the use of force was found permissible when it was unnecessary or, further, counterproductive, under the circumstances to do so. Even a proportionate use of force is not justified where it is unnecessary under the circumstances. Given what a reasonable officer on the scene would have known and witnessed, there remains a genuine issue of material fact as to whether punching J.H. in the face was necessary. Therefore, Mrs. Hamilton excessive force and battery claim against Officer Green should proceed.

(Pl.'s Br. 21–22.)

15

officer. Force that is reasonable while a suspect poses a threat may no longer be reasonable as the threat decreases. *Cyrus v. Town of Mukwonago, Wis.*, 624 F.3d 856, 863 (7th Cir. 2010). It would have been clear to a reasonable officer that he could not strike a handcuffed and compliant individual who posed little threat. Likewise, if J.H. had been only passively resisting, the degree of force considered reasonable would likely not include a strike. Here, however, the designated evidence is that Officer Green delivered the strike during a period when J.H. was actively resisting. Indeed, it came immediately after J.H. kicked Officer Sierks. Accordingly, J.H. still posed a threat, not only to the officers, but to himself.

The danger J.H. presented to himself was due to the fact that the handcuffs would not have prevented J.H. from being able to run, which was the very act that the officers and the Plaintiff were trying to prevent. The fact that J.H. had the intellectual functioning of a five-year-old inside of an adult-strength body (i.e., was, as the Plaintiff describes him, "a mentally disabled minor") only added to the danger that J.H. presented to himself if he broke free while he was still visibly upset and seemingly determined to flee the area. It was obvious by this point that verbal pleas and warnings were not effective, and that J.H. was not opposed to being combative to get his away. A condition that causes an unpredictable response does not necessarily "neutralize the safety threat, but rather [may] exacerbate[] it," *Smith v. Ball State Univ.*, 295 F.3d 763, 769 (7th Cir. 2002), and that response becomes part of the totality of circumstances facing officers who must make split second decisions. *See also Padula v. Leimback*, 656 F.3d 595, 603 (7th Cir. 2011) (finding that the force used to remove a motorist from his car because he appeared intoxicated but was actually suffering from hypoglycemic episode, and subduing motorist, including macing, striking with batons, holding in a prone position for fairly short period while

trying to prevent the motorist from injuring himself or officers, and placing him in handcuffs, was not excessive). In an analogous case, *Griggs v. Brewer*, 841 F.3d 308, 315–16 (5th Cir. 2016), the court granted qualified immunity to an officer who punched the plaintiff in the face after the plaintiff, who was handcuffed and seated with his legs out of a squad car, kicked the officer in the chest. The court reasoned that cases involving force against restrained suspects were not applicable because the plaintiff's kick evidenced that he was not yet subdued and still posed a danger. *Id.* at 316. The court also considered that the plaintiff had been actively resisting arrest, was intoxicated, and had evinced erratic behavior. *Id.* The court stated that "the use of force was the sort of 'split-second judgment' in a difficult situation that qualified immunity is designed to protect." *Id.* (quoting *Graham*, 490 U.S. at 396–97).

The Plaintiff asserts that Officer Green's action was counterproductive, but there is no evidence that Officer Green should have known that his method would be counterproductive, or even that it actually was counterproductive.[5] In any event, courts should not rely on 20/20 hindsight to determine the reasonableness of a particular use of force. *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.") (internal citation omitted). "Qualified immunity, in effect, affords enhanced deference to officers' on-scene judgments about the level of necessary force." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 725 (7th Cir. 2013); *see also Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir.1996) (noting, in the excessive force context, that the "police cannot have the specter of a § 1983 suit hanging over their heads when they are confronted with a

---

[5] By not providing any explanation, the Court is left guessing why the Plaintiff believes the strike was not effective in helping to control J.H. and get him safely placed in the squad car. The sequence of events suggests just the opposite.

dangerous fugitive, possible escapee, or as long as their behavior falls within reasonable limits").

Although the Plaintiff does not mention Officer Green's threat to tase J.H. in her analysis of the excessive force claim, she does wonder in the Statement of Genuine Disputes section whether Officer Green reasonably believed the threat "would command compliance." (Pl.'s Br. 8.) She argues that the Defendants seem to argue so, but that she "contends otherwise and that it was unnecessary escalation of events and evidence of Defendant Officer Green's willingness to resort to unnecessary use of force, particularly in light of J.H.'s seizure condition." (*Id.*) The Court finds that a verbal warning about a particular use of force that never transpires is not the same as actually using the force. Even if it were appropriate to consider subjective intent, *Graham*, 490 U.S. at 397 (officer's subjective intent or motivations are not a consideration in Fourth Amendment analysis), it is difficult to understand how a verbal warning evidences an intent to use "unnecessary" force. The general purpose of issuing a warning is to give the individual an opportunity to become compliant and *avoid* the use of the force. Nor can the warning be blamed for escalating J.H.'s response to the officers as Officer Green did not even have his taser drawn and, by the Plaintiff's own account, the warning had no impact on J.H. because he did not understand it. The Plaintiff immediately informed Officer Green that a taser should not be used on her son due to his condition—and no taser was used.

Because the Defendant has raised qualified immunity as a defense to the Plaintiff's excessive force claim, it is the Plaintiff's burden to defeat it. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). Because the force Officer Green used was not "so plainly excessive that, as an objective matter," he "would have been on notice that [he was] violating the Fourth Amendment," the Plaintiff must identify a "closely analogous case that established a right to be

free from the type of force" Officer Green used. *Findlay v. Lendermon*, 722 F.3d 895, 899 (first

citing *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008); then quoting *Clash*, 77 F.3d at

1048). The Plaintiff has not carried this burden. She has not offered any case with even remotely

similar facts that would have put Officer Green, and any reasonable official in his position, on

notice that he was violating J.H.'s rights in the particular circumstances that he faced. In

response to Officer Green's claim of immunity, the Plaintiff cites to two cases involving tight

handcuffs, and to a Supreme Court case for the proposition that "[f]orce applied 'maliciously and

sadistically to cause harm' is not necessary force." (Pl.'s Br. 23 (quoting *Whitley v. Albers*, 475

U.S. 312, 320–21 (1986).) The Plaintiff has made no claim that J.H.'s handcuffs were too tight.

*Whitley* involved a question under the Eight Amendment regarding the security measures prison

staff used to resolve a disturbance.

The Court cannot, considering the totality of circumstances, find that "no reasonably

competent officer would have concluded," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), that

Officer Green's single strike to J.H.'s face was justified under the circumstances. Officer Green

is entitled to qualified immunity and, thus, to summary judgment on the Plaintiff's Fourth

Amendment excessive force claim.

**D.      State Tort Claims**

The Plaintiff has brought assault and battery claims against Officer Green, and against

the City under respondeat superior. The jurisdiction of the Court over the state law claims is

based on the supplemental jurisdiction statute, 28 U.S.C. § 1367(a). The statute also provides

that the district court may decline to exercise supplemental jurisdiction if "the district court has

dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[T]he

general rule is that, when all federal claims are dismissed before trial, the district court should

relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits."

*Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994); *see also Groce v. Eli*

*Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) (noting that established law of this circuit is that

the "usual practice" is to dismiss without prejudice state supplemental claims whenever all

federal claims have been dismissed before trial). An exception to the usual practice exists where

it is clearly apparent how the state claim is to be decided. *See Williams Elecs. Games, Inc. v.*

*Garrity*, 479 F.3d 904, 907 (7th Cir. 2007); *Wright*, 29 F.3d at 1251 ("If the district court, in

deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving

the latter to the state court.").

 The Defendant asserts that the Plaintiff's assault and battery claims fail for the same

reasons that her Fourth Amendment excessive force claim fails. It is true that such claims can

rise or fall with § 1983 excessive force claims.

> An actor commits a battery if "(a) he acts intending to cause a harmful or offensive
> contact with the person of the other or a third person . . . and (b) a harmful contact
> with the person of the other directly or indirectly results." *Mullins v. Parkview Hosp.,*
> *Inc.*, 865 N.E.2d 608, 610 (Ind. 2007). A battery claim under Indiana law alleging
> excessive force by law enforcement is measured by the same standards set forth
> above for excessive force under the Fourth Amendment. *See Fidler v. City of*
> *Indianapolis*, 428 F. Supp. 2d 857, 866 (S.D. Ind. 2006) ("Indiana's excessive force
> standard effectively parallels the federal [Fourth Amendment] standard."). Like the
> Fourth Amendment standard, Indiana law only permits a law enforcement officer to
> use "reasonable" force when effectuating an arrest. Ind. Code § 35–41–3–3(b).

*Estate of Williams v. Ind. State Police*, 26 F. Supp. 3d 824, 862–63 (S.D. Ind. 2014), *aff'd sub*

*nom. Williams v. Ind. State Police Dep't*, 797 F.3d 468 (7th Cir. 2015).

 Here, the Court has not decided whether Officer's Green's use of force against J.H. after

he kicked Officer Sierks was reasonable. Rather, the Court's ruling is that Officer Green is entitled to qualified immunity against any claim that his use of force was objectively unreasonable under the circumstances because, even if it was, that right was not clearly established at the time of the alleged violation. Accordingly, the Court has made no ruling that resolves whether Officer Green committed battery against J.H. or otherwise makes it apparent how the state claim is to be decided.

In accordance with 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over the remaining state law claim. Section 1367(d) grants the Plaintiff an additional thirty days (or longer if provided by State law) to re-file the dismissed supplemental claim in state court.

## CONCLUSION

For the reasons stated above, the Defendants' Motion for Summary Judgment [ECF No. 47] is GRANTED IN PART and DENIED IN PART. The Clerk is DIRECTED to DISMISS WITHOUT PREJUDICE the Plaintiff's state tort claim (Claim IV of the First Amended Complaint) and to enter judgment in favor of the Defendants and against the Plaintiff on the federal claims.

SO ORDERED on November 13, 2017.

 s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT